UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ESTATE OF ESTHER KLIEMAN | : | |
| by and through its Administrator, | : | |
| AARON KESNER | : | |
| 4840 W. Foster Street | : | |
| Skokie, IL 60077 | : | |
| | : | |
| and | : | |
| | : | |
| NACHMAN KLIEMAN | : | |
| Halamish 359 | : | |
| D.N. Modi'in | : | |
| 71945, Israel | : | Civil Action No. |
| | : | |
| and | : | |
| | : | |
| RUANNE KLIEMAN | : | |
| Halamish 359 | : | |
| D.N. Modi'in | : | |
| 71945, Israel | : | |
| | : | |
| and | : | |
| | : | |
| DOV KLIEMAN | : | |
| Kiryat Netafim | : | |
| D.N. Ephraim | : | |
| 44815, Israel | : | |
| | : | |
| and | : | |
| | : | |
| YOSEF KLIEMAN | : | |
| 6018 N. Jersey | : | |
| Chicago, IL 60659-2306 | : | |
| | : | |
| and | : | |
| | : | |
| ESTATE OF GAVRIEL KLIEMAN | : | |
| By and through its Legal Representatives | : | |
| NACHMAN KLIEMAN & RUANNE KLIEMAN | : | |
| Halamish 359 | : | |
| D.N. Modi'in | : | |
| 71945, Israel | : | |
| | : | |

Plaintiffs,                          :
                                     :
            v.                       :
                                     :
THE PALESTINIAN AUTHORITY (a.k.a.    :
"THE PALESTINIAN INTERIM SELF-       :
GOVERNMENT AUTHORITY")               :
                                     :
      Registered Agent:              :
      Squire Patton Boggs ((US) LLP  :
      2550 M Street, NW              :
      Washington, DC  20037          :
                                     :
and                                  :
                                     :
THE PALESTINIAN LIBERATION           :
ORGANIZATION                         :
1732 Wisconsin Ave, NW[1]            :
Washington, DC  20007                :
                                     :
            Defendants.              :
_____:

## **COMPLAINT**

1.      This action is brought pursuant to federal counterterrorism statutes, Antiterrorism

Act of 1991, 18 U.S.C. §§2331 *et seq.,* and supplemental causes of action by the Estate, family,

survivors, and heirs of Esther Klieman, a United States citizen, who was murdered as a result of

the Palestinian Authority and Palestinian Liberation Organization's ("PA and PLO" or

"Defendants") support for the Al Aqsa Martyrs Brigade ("AAMB") on March 24, 2002 near

Neve Tzuf, Israel.  Plaintiffs sue for damages directly and proximately caused by the Defendants

to Plaintiffs by reason of acts of unlawful international terrorism, as defined in 18 U.S.C. §2331,

---

[1] On May 7, 2018 the General Delegation of the PLO filed a FARA registration statement listing its business address as 1732 Wisconsin Ave, NW, Washington, DC 20007.  Upon information and belief, in October 2018, the PLO closed this office.  Updated registration statements identifying a new address have not been filed.  Plaintiffs will update this information, when and if new information becomes available.

and by reason of related unlawful tortious behavior and conduct entitling the Plaintiffs to an award of damages as shall be proven at the trial of the within action.

2.      At all times relevant to this Complaint agents, officials, and employees of the PA and PLO acted jointly at all times in the influence campaign waged in the United States to promote a change in U.S. foreign policy, based upon the murder and injury of innocent civilians by PA and PLO agents and/or supported terrorists such as AAMB, as the PA or PLO agents in the United States would have been working on the same mission, to represent the "voice of Palestine."

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter and over Defendants pursuant to 18 U.S.C. §2333 and §2334 and the rules of supplemental jurisdiction.

4.      The Court may exercise personal jurisdiction over the Defendants under the Antiterrorism Clarification Act of 2018 ("ATCA"), Pub. L. 115-253 and also because Esther's murder was an act of international terrorism as defined in 18 U.S.C. §2331.

5.      The District Court for the District of Columbia is the proper venue pursuant to 28 U.S.C. 1391(b)(3) and18 U.S.C. §2334(a) since Defendants the Palestinian Authority and the Palestine Liberation Organization, have an agent present in the District of Columbia, may be served in the District of Columbia, and conduct business in this District of Columbia.

## PARTIES

6.      Plaintiff Estate of Esther Klieman, a Cook County, Illinois estate, is represented in this action by its duly appointed Administrator, Aaron Kesner. Plaintiff Estate of Esther Klieman can sue and be sued in this Court.

3

7.      Plaintiffs Nachman Klieman and Ruanne Klieman at all times relevant hereto are and were the natural parents of the deceased, Esther Klieman.  Nachman Klieman and Ruanne Klieman are citizens of the United States of America and of the State of Israel and are presently domiciled in Israel and can sue and be sued in this Court.

8.      Dov Klieman, Yosef Klieman and Gavriel Klieman (now deceased) are the siblings of Esther Klieman.  Plaintiffs Dov Klieman, Yosef Klieman and Estate of Gavriel Klieman are each citizens of the United States of America and of the State of Israel and are each presently domiciled in Israel. Plaintiffs Dov Klieman, Yosef Klieman and Estate of Gavriel Klieman can sue and be sued in this Court.

9.      Defendant the Palestinian Authority, also known as the Palestinian Interim Self-Government, and the Palestinian National Authority (hereinafter "PA") is and at all times relevant hereto was, a legal person as defined in 18 U.S.C. §2331(3), established by and existing under and by virtue of international instruments, customary international law and local law.  At the time of the terrorist attack that killed Esther Klieman, the PA established, maintained, or procured offices and had designated agents the District of Columbia, United States of America. It can sue and be sued in the United States District Court for the District of Columbia.

10.     Defendant the Palestine Liberation Organization (hereinafter "PLO") is, and at all times relevant hereto was, a legal person as defined in 18 U.S.C. §2331(3), in *de jure* and *de facto* control of Defendant PA, and its agencies and instrumentalities, by virtue of being party to and beneficiary of the international instruments by which Defendant PA was established.  At the time of the terrorist attack that killed Esther Klieman, the PLO established, maintained, or procured offices and designated agents in, United States District Court situated in the District of

Columbia, United States of America.  It can sue and be sued in the United States District Court for the District of Columbia.

11.     The PA and PLO were two separate entities that at all time relevant to this Complaint acted in concert in the course of the criminal conspiracy described below, their goals were the same, to influence the U.S. government as defined in 18 U.S.C. §2331 to pressure Israel to accommodate the PA and PLO's political goals.

12.     In 2002 and since then, the PA and PLO have received large quantities of U.S. foreign assistance under section 481 and chapters 4 and 9 of part II of the Foreign Assistance Act of 1961 (22 U.S.C. 2346 et seq.).

13.     As of the date of the filing of this complaint, "U.S. funding to the Palestinians . . . continues unabated" in the form of "bilateral aid from the INCLE account."[2]

## STATEMENT OF FACTS

14.     At all times relevant hereto, Defendants PA and PLO were in *de jure* and *de facto* control of territories in the Gaza Strip and the West Bank.

15.     At all times relevant hereto, AAMB, Fatah, Tanzim, and Force 17 (as all described below) and their operatives and agents maintained and operated a leadership command, organizational hierarchy and operational infrastructure including, *inter alia*, training facilities and depots for the storage of weapons and explosives in territories controlled by Defendants PA and PLO.

---

[2] Jim Zanotti, Cong. Research Serv., RS22967, *U.S. Foreign Aid to the Palestinians* at 8 (Nov. 2, 2018), https://fas.org/sgp/crs/mideast/RS22967.pdf. The INCLE account is authorized by § 481 of the Foreign Assistance Act of 1961, *see* U.S. State Dept., *U.S. Foreign Assistance Reference Guide* at 41 (2005), https://pdf.usaid.gov/pdf_docs/pnadc240.pdf.

16.     At all times relevant hereto, Yasser Arafat (hereinafter "Arafat") was the duly elected or designated Chairman, or President, of Defendants PA and PLO.  He was also the Chairman of the PLO from 1969 to 2004, and the President of the PA from 1994 to 2004.  By virtue of these positions, Arafat was in *de jure and de facto* control of Defendants PA, PLO and their various agencies and instrumentalities.  Arafat was also the head and leader of Fatah, AAMB, Tanzim and Force 17, all of which are instrumentalities of PLO and/or PA.  Through these positions, Arafat and his close subordinates functionally retained exclusive control over the Palestinian security forces until his death.

17.     Defendants organized their agents and employees into various specially-trained units and cells, which planned and executed terrorist attacks on behalf of and for the PLO and PA. These terrorist units and cells were defendants' agents, instrumentalities, agencies, organs and/or alter egos, wholly funded and controlled by them.  At all relevant times, these terrorist units, including, Al-Aqsa Martyrs Brigades also known as Martyrs of Al Aqsa (hereinafter AAMB), Fatah, Tanzim, and Force 17 planned and carried out terrorist attacks on defendants' behalf.

18.      AAMB, at all times relevant hereto, was based in and operated from the Palestinian territories controlled by Defendants PA and PLO. The AAMB, as evidenced by its proclamations, was dedicated to terrorism and the murdering of Israeli and Jewish individuals through bombings, shootings and other violent means.

19.     AAMB is the military arm of the Fatah terrorist organization, which was led by Arafat in his individual and/or official capacities on behalf of the PA and/or PLO.

20.     AAMB was designated as a "Foreign Terrorist Organization" by the United States Department of State on March 27, 2002, and can be sued in this Court for the acts it committed, and/or for which it has publicly accepted responsibility.  AAMB was led by Marwan Barghouti, who, upon information and belief, reported to Arafat until Marwan Barghouti's imprisonment.

21.     Fatah is based in and operates from territories controlled by Defendants PA and PLO, and which by its very nature and proclamations is dedicated to terrorism and the murdering of Israeli and Jewish individuals through bombings, shootings and other violent means.

22.     Fatah is an official branch, agency and instrumentality of Defendant PLO.  Fatah was led by Arafat in his individual and/or official capacities on behalf of the PA and/or PLO and is a faction of the PLO.  Fatah is a terrorist organization funded by Defendants PA and/or PLO.

23.     Tanzim is based in and operates from territories controlled by Defendants PA and PLO, and which is by its very nature and proclamations dedicated to terrorism and the murdering of Israeli and Jewish individuals through bombings, shootings and other violent means.

24.      Tanzim function as the guard and military force, and was ultimately led and controlled by Yasser Arafat in his individual and/or official capacities on behalf of the PA and/or PLO and is an arm thereof.  Tanzim is a terrorist organization and is funded by Defendants PA and/or PLO.

25.     Force 17 is based in and operates from territories controlled by Defendants PA and PLO, and which by its very nature and proclamations is a terrorist organization dedicated to the murdering of Israeli and Jewish individuals through bombings, shootings and other violent means.

26.     Force 17 functions as the guard and military force, and was ultimately led and controlled by Yasser Arafat in his individual and/or official capacities on behalf of the PA and/or the PLO, and is a faction of the PA and/or PLO. Force 17 is a terrorist organization funded by Defendants PA and/or PLO.

## THE SECOND INTIFADA

27.     Arafat has a long history and record of committing, causing or directing to be committed, murders and attacks upon U.S. citizens, Israelis, and Jewish people.  Prior to the acts complained of herein, Arafat purported, on behalf of the PA and PLO, to renounce terrorism, pursuant to the Oslo Accords.  He negotiated, from time to time, on behalf of the Palestinian people, PA and/or PLO various peace agreements with representatives of the government of the State of Israel.   He withdrew from negotiations sponsored by U.S. President William Jefferson Clinton in the summer of 2000, and thereafter caused or created the Second Intifada, a series of violent, terrorist, murderous and brutal attacks upon the State of Israel and her people, which also targeted U.S. citizens living and visiting Israel ("Second Intifada").

28.     At the beginning of the Second Intifada, Fatah operatives, many of whom were employed in the PA's security apparatus, initiated terrorist activity against Israeli targets.  To that end, Fatah's AAMB were intended to serve as the Fatah's military wing for carrying out terrorists' attacks against Israel. The AAMB were also under Arafat's and the top leadership of Defendants' control.

29.     Through media outlets owned and controlled by the PA, and through speeches by PA and PLO officials, during the Second Intifada, Defendants directed, authorized, and incited terrorist violence against innocent civilians, some of whom were American nationals.

30.     Contemporaneously, the PA and PLO also launched an extensive influence campaign through media and other means to weaponize the casualties of the Second Intifada to manipulate the U.S. government into pressuring the Israeli government into accommodating the PA/PLO political goals.

31.     Most important were magazines published for PA police and security forces— published by the PA, edited and authored in many cases by the PA's and the PLO's so-called "Political Guidance" apparatus, and distributed to security and police personnel.  This "Political Guidance" apparatus had representatives in all PA security forces; its job being to "educate" PA security personnel by delegitimizing the existence of the State of Israel and to encourage terrorist-attached and martyrdom-seeking operations.

32.     Furthermore, PA TV—which Defendants owned and controlled—broadcast programs in which children expressed their wish to engage in "shahada" (suicide martyrdom) because shahada was "beautiful."  Moreover, Arafat appeared in public with his machine gun and made public speeches encouraging violence—including a notorious one to a group of children in which he glorified a child who committed suicide and then led the children in a chant of "a million martyrs marching to Jerusalem."

33.     In all, Defendants glorified the acts of terrorists, including those who injured Plaintiffs, portraying them as national heroes through state-sponsored funerals and television programs honoring their "sacrifices."

34.     Because of Defendants' pro-terror policies during the Second Intifada, hundreds of the PA's security and police employees are in jail in Israel, having been convicted of terrorist crimes during that period—as Defendants' own officials and websites proudly confirm.  Many

others were killed while carrying out terrorist attacks.   Among these were Defendants' employees who participated in the attack at issue here.

35.     Marwan Barghouti, Tamer Rassam Salim Rimawi (hereinafter "Rimawi"), Hussam Abdul-Kader Ahemed Halabi a/k/a Abu Arav (hereinafter "Halabi"), Ahmed Hamad Rushdie Hadib a/k/a Ahmed Barghouti (hereinafter ""Hadib") and Anan Azis Salim Hashash (hereinafter "Hashash") are and at all times relevant hereto were, leaders, members, operatives and trained agents of AAMB, Fatah, Tanzim and/or Force 17, acting on behalf of, as agents, representatives, and co-conspirators of,  the PA and/or PLO and/or Arafat.

36.     At all times relevant hereto, Marwan Barghouti, Rimawi, Halabi, Hadib and Hashash were leaders and/or members of Fatah, AAMB, Tanzim and/or Force 17 and were collectively organized as a cell, or cells, or groups acting separately and in concert with one another and with Arafat, the PLO and/or the PA for the illegal purposes of carrying out terrorist activities, including, but not limited to, the committing of violence upon, and murdering, U.S. citizens, Israelis and the Jewish people (hereinafter "The Terrorist Cells").

37.     The Terrorist Cells were subordinate to, and received instructions, weapons, money and material support from commanders and leaders of Fatah, AAMB, Tanzim, Force 17, PA and/or PLO including, but not limited to, Arafat, all of whom operated from the Palestinian territories controlled by Defendants PA and PLO.

38.     Rimawi, Halabi, Hashash and Hadib are the individual actors who directly carried out and participated in the attack that killed Esther Klieman.

10

## MARCH 24, 2002 INCIDENT

39.     On March 24, 2002, pursuant to a premeditated plan, on the Abud bypass road, near the village of Umm Safah, north of Ramallah, in the State of Israel or in territories administered or controlled by the State of Israel, Rimawi, Halabi, Hashash, agents of Defendants PA and PLO, without provocation and without legal justification, positioned themselves upon a ridge that overlooked the Abud bypass road.

40.     Rimawi, Halabi and Hashash were driven to the ridge by Hadib.  While Halabi and Hashash waited nearby, Rimawi opened fire with a Kalachnikov automatic rifle provided to him by Defendants, or their agents and instrumentalities, on an Egged public transport bus on Route 468 (hereinafter "the shooting attack").

41.     Esther Klieman was struck in the heart and killed by bullets fired by Rimawi in the incident.

42.     Rimawi, Halabi, Hashash and Hadib were all arrested and convicted for participating in the shooting attack.

43.      Following the shooting attack, AAMB, an arm and instrumentality of the Defendants named herein, claimed responsibility for this terrorist act of murder committed upon Esther Klieman, an innocent person who was traveling on a public bus in order to meet her life's commitment to the teaching of young people.

44.     Defendants PA and PLO, are authorized and responsible, under international instruments, customary international law and local law applying in the West Bank and Gaza, to exercise law enforcement powers and to maintain public order and security in the territories under their control and responsibility.

45.     At all times relevant hereto, Defendants PA and PLO, by and through their representatives, officials, employees and agents operated, maintained, managed, supervised and controlled various police forces, militias, paramilitary forces, intelligence services, law enforcement personnel, jails and penal institutions in the territories under their control.

46.     At all times relevant hereto, Defendants PA and PLO by and through their officials, employees and agents operated, maintained, managed, supervised and controlled various police forces, militias, paramilitary forces, intelligence services, law enforcement personnel, jails and penal institutions in the territories under their control.

47.     During the period relevant hereto, Fatah, AAMB, Tanzim, and Force 17 operating from territories controlled by Defendants PA and PLO, advocated, encouraged, solicited, facilitated, incited for, sponsored, organized, planned and executed acts of violence, murder and terrorism against civilians and other innocent persons living, working, traveling or otherwise being in Israel, Gaza and the West Bank.  During the period relevant hereto, Fatah, AAMB, Tanzim, Force 17 and Defendants carried out scores of terrorist attacks, murdering hundreds of innocent Israeli and/or U.S. civilians, and injuring thousands more, including by not limited to, the murder of Esther Klieman.

48.     Among the more than 900 civilians murdered and thousands wounded by Fatah, AAMB, Tanzim, Force 17 and others acting on behalf of the PA and/or PLO were many United States citizens.

49.     During the period relevant hereto, the government of the United States, the Congress of the United States and the government of the State of Israel, as well as others in the international community have repeatedly demanded from the PA and PLO that they take

effective measures to prevent every terrorist attack by  AAMB, Fatah, Tanzim, Force 17 and

other terrorist organizations and groups operating within the Palestinian territories, including, but

not limited to:  criminalizing the existence of and membership in AAMB, Tanzim and Force 17;

the apprehension, prosecution and imprisonment of AAMB's leadership and members; the

closure of AAMB, Tanzim and Force 17 offices and facilities; the seizure of AAMB, Fatah,

Tanzim and Force 17  property and resources including funds, weapons and explosives, and;

prosecuting AAMB, Fatah, Tanzim, Force 17 and other individuals and groups who encourage,

promote and cause the incitement to commit violence, terrorism and murder.

50.     The U.S. government made these demands because the PA and PLO exercised

control over AAMB.

51.     The PA and PLO refused and/or ignored American and Israeli demands and

requests to take effective measures to prevent further terrorist attacks by AAMB, Fatah, Tanzim

and Force 17.

52.     On the contrary, at all times relevant hereto, Defendants PA and PLO, by and

through their officials, employees and agents acting within the scope and course of their

employment and agency, pursuant to authorization and instructions of Arafat, PA and PLO and

in furtherance of the goals and purposes of the  PA and PLO, provided AAMB, Fatah, Tanzim,

Force 17, Marwan Barghouti, Hadib, Rimawi, Halabi and Hashash, with weapons,

instrumentalities, permission, training, and funding for their terrorist activities and further

provided the terrorists with safe haven and a base of operations, by permitting and/or

encouraging AAMB, Fatah , Tanzim and Force 17 to operate freely and conduct activities in the

territory under their control or in which they maintained a police presence, and to advocate,

encourage, solicit, facilitate, incite for, sponsor, organize, plan and execute acts of violence, murder and terrorism against innocent civilians in Israel, Gaza and the West Bank.

53.     Moreover, during the period relevant hereto, the State of Israel submitted to Defendants multitudes of requests to surrender for prosecution members of AAMB, Tanzim, Fatah and Force 17 suspected or charged with terrorist murders, including individuals suspected of murdering United States citizens.

54.     The PA and PLO have consistently refused these requests for the surrender of terrorist suspects, and at all times relevant hereto, provided shelter and safe haven to dozens of members of AAMB, Fatah, Tanzim, Force 17 including, but not limited to, Rimawi, Halabi, Hadib and Hashash, and other terrorists and terrorist groups suspected of or charged with the terrorist murders, including the murders of American citizens, and specifically including the murder of Esther Klieman.

55.     Moreover, upon information and belief, during the period relevant hereto, Rimawi, Halabi, Hadib and Hashash were provided salaries, rewards, and employment by Defendant PA as policemen and/or security officials in the various police, security and intelligence forces under the control of the PA, thereby making each of the Defendants co-conspirators and/or accessories before and/or after the fact of murder.

56.     Specifically, Rimawi received monies through the Palestinian National Authority Ministry of Detainee Affairs in 2003, 2004, 2005, 2006, 2007, 2008 and at least through January 2009.  These monies were paid to him by the Defendants as a result of his conviction for murdering a United States citizen, Esther Klieman.

57.     Rimawi was also referred to as a commander of AAMB.

58.     Like Rimawi, Halabi and Hadib also received monies from the Palestinian National Authority Ministry of Detainee Affairs after having been convicted and jailed for murdering Esther Klieman.   Upon information and belief, each received the amount of 800 shekels per month, during at least the years 2003, 2004 and 2005.

59.     Defendants PA and PLO, at all times relevant hereto, by and through their officials, employees and agents acting with the scope and course of their employment and agency, pursuant to the prior authorization and encouragement, permission and/or instructions of and in furtherance of the goals and purposes of the Defendants PA and PLO, granted material and financial support to the members (or their families) of AAMB, Fatah Tanzim, Force 17 who had been captured or killed while carrying out acts of terrorist violence against civilians in Israel, Gaza and the West Bank, thereby providing   AAMB, Fatah, Tanzim and Force 17 and its members with strong financial incentives, reward and compensation for the specific purpose of encouraging, permitting and rewarding the commission of and continuance of acts of violence, murder and terrorism against such victims thereby making each of the Defendants co-conspirators and/or accessories before and/or after the fact of murder.

60.     At all times relevant hereto Defendants PA and PLO and their officials, employees and agents knew that AAMB, Fatah, Tanzim and Force 17 had committed hundreds of serious offenses against innocent civilians including citizens of the United States and that Defendants AAMB, Fatah, Tanzim, Force 17 and their individual terrorist members planned to continue committing such offenses, yet   Arafat and Defendants PA and PLO openly and consistently sheltered and received, relieved, comforted, paid, rewarded and assisted   AAMB,

Fatah Tanzim and Force 17 and their operatives, agents, representatives and members within the meaning of 18 U.S.C §3, in order to hinder and prevent their apprehension, trial and punishment.

61.     At all times relevant hereto Defendants PA and PLO and their officials, employees and agents knew that  AAMB, Fatah, Tanzim and Force 17 had committed hundreds of serious offenses against innocent civilians including citizens of the United States, and that AAMB, Fatah, Tanzim and Force 17 planned and still plan to continue committing such offenses, yet  Arafat and Defendants PA and PLO openly and consistently provided  AAMB, Fatah, Tanzim and Force 17 and their members with safe haven, a base of operations, shelter, financial support, encouragement, permission and other material support and resources within the meaning of 18 U.S.C. §2339A.

62.     Additionally, Defendants PA and PLO and their officials, employees and agents solicited, encouraged, permitted and advised AAMB, Fatah, Tanzim, Force 17, Rimawi, Halabi, Hashash and Hadib to commit the acts attributed to them as alleged herein and aided, abetted, authorized, ratified, encouraged, permitted and participated in those acts.

63.     The acts and omissions of Defendants PA and PLO described herein were committed by and through their officials, employees and agents acting within the scope and course of their employment and agency, with the authorization and ratification, and pursuant to the instructions of Arafat and Defendants PA and PLO, and in furtherance of the goals, directives, policies and purposes of Defendants PA and PLO.

64.     While the Second Intifada raged in and near Israel, the PA and PLO launched an extensive influence campaign to weaponize the casualties of the Second Intifada to manipulate the U.S. government into pressuring the Israeli government into accommodating the PA/PLO

political goals. The PA and PLO campaign to influence U.S. policy or affect its conduct, by leveraging the carnage of the Second Intifada, was expressly directed at the forum, the United States in this case. For example, as part of the PA and PLO campaign between 2000 and 2002, Hasan Abdel Rahman, the Chief Representative of the PA and the PLO in the U.S. at the time, repeatedly argued to U.S. leaders and the American public that the only way the terrorist attacks in Israel would end is if the U.S. pressured Israel to withdraw from the contested territories. A small sampling of his statements demonstrates the linkage made between the terrorist attacks and the need for change in U.S. policy. He appeared on CNN on April 12, 2002 and stated: "one of the most brutal occupations in modern history. That's what turns people into suicide bombers." He appeared on PBS, on March 29, 2002 and stated: "Mr. Colin Powell is missing the point… He should point fingers to Mr. Sharon to move his soldiers, his army, his settlers, from the Palestinian territories… if the occupation continues… no one can stop the Palestinians."

65.     He made other appearances on national TV in the U.S.:  on CNN February 3, 2002,  he stated "[t]he Jewish settlements… have to be removed in order for us to be able to establish the kind of peace that we want to establish with Israel.");  and on CNN, April 14, 2002, he stated: "I think the involvement of the United States on the site would be very, very helpful because obviously the two parties trust the United States and they want the United States to be involved…We feel that 35 years of foreign, illegal occupation is more than enough."

66.     These arguments spun together are an explicit threat that acts of terrorism will continue until Israel withdraws from certain territories and the U.S. must pressure Israel to do so.

67.     The PA and PLO secretly supported acts of terrorism which killed and injured many Americans all the while pressuring the U.S. government, under false pretenses, to act on its

behalf. The PA and PLO argument had no chance of success unless the AAMB and other groups were killing lots of civilians.

68.     It would not be the first time a terrorist campaign had been directed against U.S. citizens in order to make the United States withdraw from the Middle East. In 1983, Iranian agents attacked and murdered 241 U.S. peacekeepers in Beirut, Lebanon who had landed with U.N. approval to end a civil war, which included militants supported by the PLO. *See Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 49, 54 (D.D.C. 2003). The United States withdrew its forces soon after the attack. *See* "The Lasting Impact of 1983 Beirut Attack, Nicholas Blandford, Christian Science Monitor, October 24, 2008 online https://www.csmonitor.com/World/Middle-East/2008/1024/p07s01-wome.html ("The bombing broke the spine of US policy toward Lebanon, and four months later the marines had been withdrawn from the country, effectively ending Washington's involvement in war-torn Lebanon for another five years.").

69.     The PLO were heavily invested in Lebanon at the time, and the memory of the forced withdrawal of the most powerful country and military in the world, as the result of the actions of a single suicide bomber, would have been seared in to the collective conscious of the PLO and all of its members in the early 1980s, who later became the leaders of the PA and PLO in the late 1990s and early 2000s. The lesson the PLO learned that day was that cheaply subsidized acts of terrorism could move political mountains and force the U.S. political system to bend to the will of the terrorist groups that launched the attack.

## COUNT I
## AGAINST ALL DEFENDANTS ON BEHALF OF ALL PLAINTIFFS
## INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C §§ 2331 and 2333(a)

70.     The proceeding paragraphs are incorporated by reference as though fully set forth herein.

71.     Defendants' acts constitute a violation of the criminal laws of the United States and of the several States, or would constitute criminal violations if committed within the jurisdiction of the United States and of the several States. Defendants' actions, if committed within a U.S. jurisdiction, would violate numerous federal and state criminal statutes prohibiting murder, assault, terrorism, use of weapons of mass destruction, material support of terrorism, harboring a terrorist, and financing terrorism.

72.     Defendants acted pursuant to, and as implementation of, an established policy of utilizing terrorist attacks to achieve their goals.  Specifically, Defendants' acts appeared intended to terrorize, intimidate and coerce the civilian population in Israel and the United States by intimidation or coercion into acquiescing to Defendants' political goals and demands.  These acts also appeared intended to influence the policy of the United States and Israeli governments by intimidation or coercion into accepting Defendants' political goals and demands.  Moreover, Defendants, themselves and through their respective officials, representatives, spokesmen, communications media and other agents: (1) repeatedly admitted to committing acts of terrorism and violence against the civilian population in Israel and the West Bank, (2) expressly stated that these acts were intended to intimidate and coerce that civilian population into acquiescing to Defendants' political goals and demands and to influence the policy of the United States and Israeli governments by intimidation or coercion in favor of Defendants' political goals and demands, and (3) expressly threatened the further occurrence of such terrorist acts if their political goals and demands were not achieved.  As a result, Defendants' acts appeared to be

intended to intimidate and coerce a civilian population, and to influence the policy of a government by intimidation or coercion, within the meaning of 18 U.S.C. §2331.

73.     Defendants' acts occurred outside the territorial jurisdiction of the United States, and constitute "international terrorism" under § 2331(1).

74.     Defendants' acts were dangerous to human life, by their nature and as evidenced by their consequences.

75.     Defendants' actions constitute acts of international terrorism directly and proximately caused the above Plaintiffs' severe injuries, including death, pain and suffering, pecuniary loss, loss of income, loss of guidance, companionship and society, loss of consortium, severe emotional distress and mental anguish, and loss of solatium.  Thus, Defendants are liable to the above plaintiffs under § 2333(a).

76.     For the reasons stated above, Defendants are jointly and severally liable to Plaintiffs, the Estate of Esther Klieman, Nachman Klieman, Ruanne Klieman, Dov Klieman, Yosef Klieman and the Estate of Gavriel Klieman.

## COUNT II
## AGAINST ALL DEFENDANTS ON BEHALF OF ALL PLAINTIFFS
## FOR ACTS OF INTERNATIONAL TERRORISM
## (PURSUANT TO 18 U.S.C. §§ 2333(d)(2))

77.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

78.     Insofar as alleged above, members of the AAMB committed, planned, or authorized the acts of international terrorism that caused the above Plaintiffs' injuries.  These members acted within the scope of their agency and membership, pursuant to AAMB prior authorization, instructions, solicitation and directives, in furtherance of their goals and policies.

79.     The United States designated the AAMB as a "Foreign Terrorist Organization under 8 U.S.C. § 1189 on March 27, 2002.

80.     Defendants aided and abetted and/or conspired to commit these acts of international terrorism through the use of funds, weapons, means of transportation and communication, safe harbor, and/or other material support and resources.  They knowingly provided this substantial assistance while being aware—based on information provided to them either through their own information gathering apparatus, or based on information provided to them by other governmental authorities, or through common knowledge at the time—that these members carried out, and intended to further carry out, acts of international terrorism.

81.     The above members of the AAMB acts of international terrorism, which Defendants aided and abetted and/or conspired to commit, directly and proximately caused the above plaintiffs' severe injury, including: death, pain and suffering, pecuniary loss, loss of income, loss of guidance, companionship and society, loss of consortium, severe emotional distress and mental anguish, and loss of solatium. Thus, Defendants are liable to the above plaintiffs under § 2333(d)(2).

82.     For the reasons stated above, Defendants are jointly and severally liable to Plaintiffs, the Estate of Esther Klieman, Nachman Klieman, Ruanne Klieman, Dov Klieman, Yosef Klieman and the Estate of Gavriel Klieman.

**COUNT III**
**AGAINST ALL DEFENDANTS ON BEHALF OF ALL PLAINTIFFS**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

83.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

84.     Pursuant to 28 U.S.C. §1367, Plaintiffs may bring supplemental causes of action.

85.     Defendants' conduct was willful, outrageous, was dangerous to human life and constituted a violation of applicable criminal law and all international standards of civilized human conduct and common decency.

86.     Defendants' conduct was intended and did terrorize the Plaintiffs and caused them egregious emotional distress.

87.     The acts and omissions of Defendants as described herein were committed by and through their officials, employees and agents acting within the scope and course of their employment and agency, with the authorization and ratification and pursuant to the instructions of Defendants and in furtherance of the goals and purposes of Defendants.   Defendants are therefore vicariously liable for the acts and omissions of their officials, employees, agents and representatives.

88.     By reason and as a result of Defendants' intentional behavior described herein, Esther Klieman was murdered, thereby causing the decedent and Plaintiffs Nachman Klieman, Ruanne Klieman, Dov Klieman, Yosef Klieman and the Estate of Gavriel Klieman severe and permanent injury, including, but not limited to, mental anguish, pain and suffering; loss of pecuniary support; loss of income; emotional distress; loss of society and companionship, and loss of solatium, thereby entitling each of them to damages to the maximum extent allowed by laws as shall be proved at the trial of this action.

89.     For the reasons stated above, Defendants are jointly and severally liable to Plaintiffs, the Estate of Esther Klieman, Nachman Klieman, Ruanne Klieman, Dov Klieman, Yosef Klieman and the Estate of Gavriel Klieman.

**COUNT IV**
**AGAINST ALL DEFENDANTS ON BEHALF OF ALL PLAINTIFFS**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

90.     The preceding paragraphs are incorporated by reference as though fully set forth

herein.

91.     Pursuant to 28 U.S.C. §1367, Plaintiffs may bring supplemental causes of action.

92.     Defendants' conduct was willful, outrageous, grossly negligent and/or negligent

and was dangerous to human life and constituted a violation of applicable criminal law and all

international standards of civilized human conduct and common decency.

93.     Defendants' conduct was intended and did terrorize the Plaintiffs and caused them

egregious emotional distress.

94.     The negligent acts and omissions of Defendants described herein were committed

by and through their officials, employees and agents acting within the scope and course of their

employment and agency, with the authorization and ratification and pursuant to the instructions

of Defendants and in furtherance of the goals and purposes of Defendants.   Defendants are

therefore vicariously liable for the negligent acts and omissions of their officials, employees,

agents and representatives.

95.     By reason and as a result of Defendants' negligent behavior described herein,

Esther Klieman was murdered, thereby causing the decedent and Plaintiffs Nachman Klieman,

Ruanne Klieman, Dov Klieman, Yosef Klieman and the Estate of Gavriel Klieman severe and

permanent injury, including, but not limited to, mental anguish, pain and suffering; loss of

pecuniary support; loss of income; emotional distress; loss of society and companionship, and

loss of solatium, thereby entitling each of them to damages to the maximum extent allowed by laws as shall be proved at the trial of this action.

96.     For the reasons stated above, Defendants are jointly and severally liable to Plaintiffs, the Estate of Esther Klieman, Nachman Klieman, Ruanne Klieman, Dov Klieman, Yosef Klieman and the Estate of Gavriel Klieman.

## COUNT V
## SECONDARY LIABIITY
## FOR ALL NON-FEDERAL CLAIMS

97.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

98.     Defendants knowingly and willingly conspired, agreed and acted in concert with each other, with their agents and employees in a common plan and design to facilitate and cause acts of terrorism including the terrorist attacks in which plaintiffs were harmed.

99.     Defendants provided one another, and their organs, agencies, instrumentalities, officials, agents and employees, and their other co-conspirators, with material support and resources and other substantial aid and assistance, in order to aid, abet, facilitate and cause the commission of acts of terrorism including the terrorist attacks in which Plaintiffs were harmed.

100.     As a result of the terrorist attacks caused, resulting from and facilitated by Defendants' provision of material support and resources and other acts of aiding and abetting, Plaintiffs suffered the damages enumerated herein.

101.     Defendants are therefore jointly and severally liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

102.     Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large warranting an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs requests judgment against the Defendants as follows:

1.     Judgment against the Defendants, jointly and severally, for the compensatory damages to which Plaintiffs is entitled under the laws of the United States of America in amounts as shall be proven at trial, but no less than One Hundred Eighty Million ($180,000,000) Dollars .

2.     Judgment against Defendants, jointly and severally, for threefold the damages and to which each and all of the Plaintiffs may be and are entitled under applicable law, all in an amount to be determined at trial, and as provided in 28 U.S.C. §2333.

3.     Judgment against Defendants, jointly and severally for punitive damages.

4.     Judgment against the Defendants, jointly and severally, for all costs expended herein.

5.     Judgment against the Defendants, jointly and severally, for reasonable attorneys' fees incurred incident hereto.

6.     Prejudgment and post-judgment interest thereon at the legal rate from date of judgment until paid in full.

7.     Judgment against Defendants, jointly and severally, for any and all other relief to which Plaintiffs may be entitled.

8.     A trial by jury on all issues so triable.

9.     Leave of Court to amend this Complaint as the interests of justice require.

December 20, 2018                          Respectfully Submitted,

                                          HEIDEMAN NUDELMAN & KALIK P.C.
                                          1146 19th Street, 5th Floor
                                          Washington, DC  20036
                                          Telephone:  202-463-1818
                                          Telefax:  202-463-2999
                                          Email:  rdheideman@hlnklaw.com

                                          By:_____/s/ Tracy Reichman Kalik_____
                                               Richard D. Heideman (No. 377462)
                                               Noel J. Nudelman (No. 449969)
                                               Tracy Reichman Kalik (No. 462055)

                          THE PERLES LAW FIRM, P.C.
                          Steven R. Perles
                          Edward Macallister
                          1050 Connecticut Ave., N.W.
                          Suite 500
                          Washington, D.C. 20036
                          (202) 955-9055